IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ZENITH INSURANCE COMPANY, <br> **Plaintiff,** <br> v. <br> MARTIN P. NEWELL, JR. AND M.P.N., INC., <br> **Defendants.** | CIVIL ACTION <br><br><br> NO. 20-3878 |

**OPINION**

In this not-so-run-of-the-mill insurance coverage dispute, the question presented is whether Plaintiff Zenith Insurance Company ("Zenith") has a duty to defend and indemnify Defendants M.P.N., Inc. ("MPN") and Martin P. Newell (collectively, "Defendants") with respect to an underlying state tort action.

**I.     BACKGROUND**

   **A.  The Underlying Action**

This action arises from a personal injury lawsuit filed by Jerry Mercer, Jr. ("Mercer Jr."), a former MPN employee, and his son, Jerry Mercer, III ("Mercer III") in the Philadelphia Court of Common Pleas, in which both MPN and Newell—MPN's owner—are named as defendants.

 The Mercers allege the following facts in their underlying action.  From May 2015 to November 17, 2017, Mercer Jr. worked for MPN at its Philadelphia, Pennsylvania assembly plant soldering radiator parts using a lead and cadmium alloy.  Mercer Jr.'s employment regularly exposed him to toxic substances.  Because of this exposure, OSHA regulations required that MPN monitor Mercer Jr. by measuring the lead, zinc, and cadmium levels in his blood.

On May 13, 2016, MPN prepared a letter to Mercer Jr. stating that a blood draw showed Mercer Jr.'s blood lead level to be 35 micrograms/deciliter, close to OSHA's acceptable level of

1

40 micrograms/deciliter.  The letter further reported Mercer Jr.'s blood zinc level to be 216 micrograms/deciliter, more than seven times OSHA's acceptable level of 30.  The Mercers allege that the May 13 letter falsified Mercer Jr.'s blood lead level, because a lead level of 35 and zinc level of 216 cannot biologically exist simultaneously.  They further allege that Mercer Jr.'s elevated zinc level put MPN on notice that lead was accumulating in his brain.  MPN, upon notice of Mercer Jr.'s abnormal zinc levels, was required to remove Mercer Jr. from his work duties and provide him with medical removal benefits.  It failed to do so.  Instead, for the next six months MPN concealed from Mercer Jr. the May 13 letter while lead continued to accumulate in his brain.

On November 2, 2016, Dr. Andrew Bandulak reviewed Mercer Jr.'s zinc level and ordered MPN to immediately remove Mercer Jr. from further lead exposure pending a medical evaluation and toxicology consult.  Defendants did not inform Mercer Jr. of Dr. Bandulak's order, so he continued to work.  On November 19, 2016, an MPN employee named Romeo handed Mercer Jr. the May 13 letter, along with a written instruction to see a doctor.  At the same time, Romeo threatened to fire Mercer Jr. "with no money" if his "zinc got any higher."  Mercer Jr. interpreted Romeo's statement to mean that his zinc level was high but not dangerously so, and thus continued to solder parts into radiators for MPN until his termination on November 17, 2017.  As a consequence of Defendants' conduct, Mercer Jr. suffered permanent brain damage.

Based on these allegations, the Mercers sued MPN and Newell for: (1) fraudulent misrepresentation; (2) medical monitoring; (3) battery; and, (4) intentional infliction of emotional distress.  Mercer III, who allegedly resided with Mercer Jr. while the latter was employed with MPN, is a plaintiff in the underlying action only with respect to the medical monitoring claim.  Although Mercer III was never an MPN employee, he alleges that he too

suffered lead exposure due to secondary lead contamination in the Mercer residence caused by MPN's failure to prevent lead accumulation in its assembly plant. Unlike Mercer Jr., Mercer III does not presently allege any active symptoms associated with lead exposure.

### B. The Zenith Policy

Zenith issued three identical insurance policies to MPN for three annual policy periods spanning March 17, 2015 to March 17, 2018 (the "Policy").[1] The Policy contains two coverage parts: Part One – Workers' Compensation Insurance ("Part One"), and Part Two – Employers' Liability Insurance ("Part Two").

Part One provides MPN with workers' compensation insurance as follows:

> A. How This Insurance Applies
>
> This Workers' Compensation Insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.
>
> 1. Bodily injury by accident must occur during the policy period.
>
> 2. Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

Pursuant to Part One, Zenith is obligated to pay "promptly when due benefits required of you by the workers' compensation law." The Policy defines "workers' compensation law" as the workers' compensation statutes of Pennsylvania and other states. Part One also requires Zenith to defend claims for workers' compensation benefits:

> C. We Will Defend
>
> We have the right and duty to defend at our expense any claim, proceeding or suit against you for benefits payable by this insurance.

---

[1] While the policy periods are different, the essential terms, conditions, and exclusions at issue here are the same in each of the policies.

>We have the right to investigate and settle these claims, proceedings or suits.
>
>We have no duty to defend a claim, proceeding or suit that is not covered by this insurance.

Part Two provides MPN with employers' liability insurance as follows:

>This Employers' Liability Insurance applies to bodily injury by accident or bodily injury by disease.  Bodily injury includes resulting death.
>
>1. The bodily injury must arise out of and in the course of the injured employee's employment by you.
>
>2. The employment must be necessary or incidental to your work in a state or territory listed in Item 3.A of the Information Page.
>
>3. Bodily injury by accident must occur during the policy period.
>
>4. Bodily injury by disease must be caused or aggravated by the conditions of your employment.  The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

Part Two's coverage provision provides, in relevant part:

>B.  We Will Pay
>
>We will pay all sums that you legally must pay as damages because of bodily injury to your employees, provided the bodily injury is covered by this Employers' Liability Insurance.
>
>The damages we will pay, where recovery is permitted by law, include damages:
>. . .
>3. For consequential bodily injury to a spouse, child, parent, brother or sister of the injured employee; provided that these damages are the direct consequence of bodily injury that arises out of and in the course of the injured employee's employment by you.

With respect to defense, Part Two provides:

>D.  We Will Defend
>
>We have the right and duty to defend, at our expense, any claim,

4

>proceeding or suit against you for damages payable by this insurance. We have the right to investigate and settle these claims, proceedings and suits.
>
>We have no duty to defend a claim, proceeding or suit that is not covered by this insurance. We have no duty to defend or continue defending after we have paid our applicable limit of liability under this insurance.

Part Two of the Policy contains several exclusions, two of which are relevant here. Pursuant to Exclusion C.4, there is no coverage for "[a]ny obligation imposed by a workers' compensation, occupational disease, unemployment compensation, or disability benefits law, or any similar law." Pursuant to Exclusion C.5, coverage is unavailable for "[b]odily injury intentionally caused or aggravated by you."

### C. The Coverage Dispute

Shortly after learning it had been sued, MPN notified Zenith of the underlying action to seek coverage for itself and Newell pursuant to Part Two of the Policy. Zenith denied MPN's tender and informed MPN of its positions that: (1) Newell is not insured under the Policy; and, (2) any liability coverage for MPN is barred by Exclusions C.4 and C.5. To date, Zenith has not participated in the underlying action.

MPN and Newell filed preliminary objections in the underlying action which the Court of Common Pleas sustained, dismissing the action. The Mercers appealed. The court then issued an opinion explaining first that the Mercers' claims against MPN were barred by the exclusivity provision of the Pennsylvania Workers' Compensation Act and, second, that the Mercers' claims against Newell failed because they did not plead that Newell personally committed any of the actions underlying these claims.[2] The question of coverage under the Policy was not addressed

---

[2] Although Mercer Jr.'s claim was dismissed by the trial court as insufficiently pleaded, the existence of an insurer's duty to defend does not, as Zenith itself notes, depend on the legal sufficiency of the underlying complaint. *See Duff Supply Co. v. Crum & Forster Ins. Co.*, 1997 WL 255483, at *6 (E.D. Pa. May 8, 1997).

in the state court proceedings, and the Mercers' appeal of the Common Pleas Court's decision is currently pending before the Pennsylvania Superior Court.

Here, Zenith seeks a declaration that it does not have a duty to defend and is not required to indemnify Defendants in the underlying action and has moved, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings.[3] Defendants, who have sought in a counterclaim a declaratory judgment to the contrary, to wit, that Zenith is obligated to defend them and is required to indemnify them, are requesting, pursuant to Federal Rule of Civil Procedure 56, partial summary judgment solely on their contention that Zenith has a duty to defend.

## II.     LEGAL STANDARD

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (quoting Fed. R. Civ. P. 56(c)). "A motion for judgment on the pleadings is a procedural hybrid of a motion to dismiss and a motion for summary judgment." *Westport Ins. Corp. v. Black, Davis & Shue Agency, Inc.*, 513 F. Supp.2d 157, 162 (M.D. Pa. 2007). Like a motion for summary judgment, a motion for judgment on the pleadings "will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290-91 (3d Cir. 1988)). Unlike a motion for summary judgment, a court generally may not consider extrinsic evidence or documents outside the pleadings, except for those documents

---

[3] Defendants allege additional counterclaims against Zenith for breach of contract and bad faith, but they are not at issue here.

"integral to or explicitly relied upon in the complaint[,]"—here, the Policy. *Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 256 n.5 (3d Cir. 2004). "While these standards of review have marked differences in most cases, they become synonymous in the context of declaratory judgment actions regarding an insurer's duty to defend." *Westport*, 513 F. Supp.2d at 163 (quoting *Kvaerner Metals Div. v. Commercial Union Ins. Co.*, 908 A.2d 888, 896 (Pa. 2006)). In short, in these types of cases, a motion for judgment on the pleadings and a motion for summary judgment are treated together with a focus on the facts alleged in the underlying complaint and the terms of the insurance policy at issue. The substantive law of Pennsylvania governs this diversity action. *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000).

### III.    DISCUSSION

Defendants concede that Part One of the Policy, pertaining to workers' compensation benefits, does not provide coverage for the Mercers' civil suit. The only issue, then, is whether the Mercers' allegations trigger Zenith's duty to defend under Part Two of the Policy.[4]

In Pennsylvania, whether coverage exists under an insurance policy is a question of law. *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005). As the Third Circuit has explained:

> Pennsylvania law on the question of an insurer's duty to defend its insured is well settled. In consideration for premiums paid, the insurer contractually obligates itself to defend its insured. This obligation arises whenever allegations against the insured state a claim to which the policy *potentially* applies, even if the allegations are "groundless, false or fraudulent."

---

[4] Defendants suggest that Zenith's Motion for Judgment on the Pleadings, which was filed prior to the close of pleadings, be denied as a procedural matter given Rule 12(c)'s requirement that such motions be filed "[a]fter the pleadings are closed." Fed. R. Civ. P. 12(c); *see also Atiyeh v. Nat'l Fire Ins. Co. of Hartford*, 742 F. Supp.2d 591, 595 (E.D. Pa. 2010) ("The pleadings are closed after an answer is filed, along with a reply to any additional claims asserted in the answer."). While Zenith's motion was filed prematurely there is no prejudice to Defendants here where the same standard of review governs both parties' motions.

*Am. Contract Bridge League v. Nationwide Mut. Fire Ins., Co.*, 752 F.2d 71, 75 (3d Cir. 1985) (quoting *Gedeon v. State Farm Mut. Auto. Ins. Co.*, 188 A.2d 320, 321 (Pa. 1963)). "[W]hen an insured tenders multiple claims to an insurer for defense, the insurer is obligated to undertake defense of the entire suit as long as at least one claim is potentially covered by the policy." *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 517-18 (3d Cir. 2012).

It is the insured's initial burden to prove the existence of coverage under the policy. *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009). But, when the insurer asserts that a policy exclusion bars coverage, the insurer "bears the burden of establishing that" the exclusion applies, and the exclusion will be "strictly construed against the insurer and in favor of the insured." *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206-07 (3d Cir. 2001). Here, Zenith disputes that Part Two of the Policy provides coverage for the bodily injury alleged by Mercer Jr. in that such injury is barred by Exclusions C.4 and C.5. Zenith therefore bears the burden of establishing that these exclusions apply. Before diving in to the analysis, some context.

### A. Workers' Compensation Exclusivity and the *Martin* Exception

Remedies for work-related injuries are generally governed by the Pennsylvania Workers' Compensation Act ("WCA"). The WCA was enacted "to provide employees with compensation for injuries sustained within the scope of their employment." *Grabowski v. Carelink Cmty. Support Servs., Inc.*, 230 A.3d 465, 470 (Pa. Super. 2020) (quoting *Abbott v. Anchor Glass Container Corp.*, 758 A.2d 1219, 1223 (Pa. Super. 2000)). A provision of the WCA provides:

> The liability of an employer under [the WCA] shall be exclusive and in place of any and all other liability to such employes, his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death. . . .

8

77 Pa. Stat. Ann. § 481(a).  This exclusivity provision "has been described as a "historical *quid pro quo* employers received for being subjected to a no-fault system of compensation for worker injuries.  That is, while the employer assumes liability without fault for a work-related injury, he is relieved of the possibility of a larger damage verdict in a common law action." *Winterberg v. Transp. Ins. Co.*, 72 F.3d 318, 322 (3d Cir. 1995) (quoting *Kuney v. PMA Ins. Co.*, 578 A.2d 1285, 1286 (Pa. 1990)).  Interpreting this provision, the Pennsylvania Supreme Court has found that Pennsylvania's statutory workers' compensation scheme—unlike those of many other states—provides blanket exclusivity for employers.  *See Poyser v. Newman & Co.*, 522 A.2d 548, 550-51 (Pa. 1987).  Thus, Pennsylvania employers are close to universally immune from tort liability for work-related injuries suffered by their employees.  *See id.*; *Barber v. Pittsburgh Corning Corp.*, 555 A.2d 766, 770-71 (Pa. 1989).

In *Martin v. Lancaster Battery Co.*, 606 A.2d 444 (Pa. 1992), however, the Pennsylvania Supreme Court crafted a narrow exception to the WCA's exclusivity provision for certain intentional employer misconduct.  The defendant employer in that case manufactured wet storage batteries for automobiles.  *Id.* at 445.  As part of the manufacturing process, the defendant's employees were exposed to considerable amounts of lead dust and fumes.  *Id.*  Pursuant to federal regulations, the defendant was required to regularly test its employees' blood lead levels.  *Id.* at 445-46.  The plaintiff employee and his wife brought a claim for fraudulent misrepresentation against the defendant, alleging that the plaintiff's manager "willfully and intentionally withheld from [the plaintiff] the results of [his] blood tests" for over three years, and "intentionally altered blood test results before forwarding the results to [the plaintiff]." *Id.* at 446.  The plaintiff, who had been diagnosed with various ailments including chronic lead toxicity, alleged that "[t]he severity of his condition would have been substantially reduced if his

9

employer had not perpetrated a delay by failing to accurately report the elevated levels of lead in [his] blood." *Id.*

The court found that the fraudulent misrepresentation claim presented by the *Martin* plaintiff was not barred by the WCA's exclusivity provision. It reasoned:

> The employee herein has alleged fraudulent misrepresentation on the part of his employer as causing the delay which aggravated a work-related injury. He is not seeking compensation for the work-related injury itself in this action. Clearly, when the Legislature enacted the [WCA] in this Commonwealth, it could not have intended to insulate employers from liability for the type of flagrant misconduct at issue herein[.] There is a difference between employers who tolerate workplace conditions that will result in a certain number of injuries or illnesses and those who *actively* mislead employees already suffering as the victims of workplace hazards, thereby precluding such employees from limiting their contact with the hazard and from receiving prompt medical attention and care.

*Id.* at 447-48. Accordingly, pursuant to *Martin*, an employee may bring a tort action against his or her employer for common law damages when the employee alleges that the employer's fraudulent misrepresentation concerning the employee's preexisting work-related injury caused a delay in medical care, thus aggravating the employee's injury. *Id.*; *Fry v. Atl. States Ins. Co.*, 700 A.2d 974, 976-77 (Pa. Super. 1997).

Like the *Martin* plaintiff, Mercer Jr. purports to state a claim against Defendants for fraudulent misrepresentation, alleging that his initial lead poisoning advanced to permanent brain injury due to Defendants' deliberate concealment, alteration, and misrepresentation of his medical test results. Zenith contends that coverage for *Martin* claims is barred by Exclusion C.5—the "intentional injury" exclusion—which rules out coverage for "[b]odily injury intentionally caused or aggravated" by the insured employer. Zenith further contends that coverage for Mercer Jr.'s non-*Martin* claims is barred by Exclusion C.4—the "workers'

compensation" exclusion—which excludes coverage for "[a]ny obligation imposed by a workers' compensation . . . law."

With this background in mind, the intentional injury exclusion is addressed first.

### B. The Intentional Injury Exclusion

Zenith argues that the intentional injury exclusion precludes coverage for Mercer Jr.'s *Martin* claim. Defendants, of course, disagree. The parties do, however, find common ground in the proposition that the employers' liability coverage offered in Part Two of the Policy was drafted for a specific purpose, namely, to provide insured employers coverage for employee bodily injury claims that fall outside the statutory workers' compensation framework. *See USX Corp. v. Liberty Mut. Ins. Co.*, 444 F.3d 192, 199 (3d Cir. 2006) ("[W]orkers' compensation is routinely written in combination with an employer's liability policy to provide protection for those situations where worker's compensation may not apply and thus avoid a gap in protection because employee claims subject to workers' compensation law are generally excluded in other types of liability policies."). Their dispute centers on whether, in asserting his *Martin* claim, Mercer Jr. has alleged that Defendants intentionally caused or aggravated his bodily injury, such that Exclusion C.5 would apply. The resolution of this dispute turns on the meaning of "intent," as that term is used in Exclusion C.5 (coverage is unavailable for "[b]odily injury *intentionally caused or aggravated by you*"), and the substance of Mercer Jr.'s *Martin* claim.

#### 1. Defining "Intent"

Pennsylvania case law provides guidance on how to interpret "intent" when construing an intentional injury exclusion. In *United Services Automobile Association v. Elitzky*, 517 A.2d 982 (Pa. Super. 1986), two insureds sought coverage under their homeowner's policy for a civil action alleging libel and intentional infliction of emotional distress. The insurer disclaimed

11

coverage pursuant to the policy's intentional injury exclusion, which barred coverage for any "bodily injury or property damage . . . [w]hich is expected or intended by the insured." *Id.* at 985. Although the trial court found that the injuries alleged in the underlying action constituted "bodily injury" and "property damage," it nevertheless found for the insurer, because, it concluded, the claims brought against the insureds in the underlying action were based solely on intentional tort theories and, thus, the intentional injury exclusion applied. *Id.*

The Superior Court reversed, noting first that "an intended harm exclusionary clause in an insurance contract is ambiguous as a matter of law and must be construed against the insurer." *Id.* at 989. It explained that "the exclusionary clause applies only when the insured intends to cause a harm," and does not apply "even if the insured should reasonably have foreseen the injury which his actions caused." *Id.* at 987. In reaching this conclusion, the court specifically relied on *Eisenman v. Hornberger*, 264 A.2d 673 (Pa. 1970), a Pennsylvania Supreme Court case in which, on breaking into another's residence to steal liquor, the insured had lighted his way through the dark by striking matches which he then dropped to the floor as they burned down. *Id.* at 673. One of the discarded matches smoldered, eventually setting the house on fire. *Id.* at 674. The owners of the residence brought suit against the insured to recover for their property damage. *Id.*

The insured tendered the defense to his insurer pursuant to a homeowner's policy which excluded from coverage "property damage caused intentionally by . . . the insured." *Id.* The *Eisenman* court found that this exclusion did not bar coverage under the facts presented. It noted that "[t]he insurance policy does not exclude damage resulting from intentional acts of the insured but only damage intentionally caused by him." *Id.* at 674. Although the insured clearly intended to light the matches, he did not intend to spark the fire; thus, coverage for the resulting

12

property damage was not clearly precluded.  *Eisenman*, 264 A.2d at 674.  In other words, "the question [was] not whether the dropping of the matches was an 'intentional act,' but rather whether the resulting property damage was 'intentionally caused' by the insured."  *Id.*

Drawing on *Eisenman*'s reasoning, the Superior Court in *Elitzky* construed "intent" for the purposes of intentional injury exclusions as follows:  "An insured intends an injury if he desired to cause the consequences of his act or if he acted knowing that such consequences were substantially certain to result."  *Elitzky*, 517 A.2d at 989.  Noting the goal of "afford[ing] maximum coverage to [the] insured," the court found that such exclusions preclude coverage "only for harm of the same general type as that which [the insured] set out to inflict," *id.* at 989, such as in the case of a gunman who, intending to shoot his victim in the foot, aims poorly and instead shoots his victim in the heart, *id.* at 988.  If, however, the insured did not intend the consequences of his actions, the exclusion will be inapplicable, "even if the insured should reasonably have foreseen the injury which his actions caused."  *Id.* at 987.

In *Minnesota Fire & Casualty Co. v. Greenfield*, 855 A.2d 854 (2004), the Pennsylvania Supreme Court cited favorably to *Elitzky*, observing that the *Elitzky* court's interpretation of "intent" was consistent with the *Eisenman* decision.  *Id.* at 863.  The *Greenfield* court considered whether an intentional injury exclusion in the insured's homeowner's policy barred coverage where the insured intentionally sold heroin (labelled "Suicide") to a friend, who then overdosed.  *Id.* at 856-57.  The lower court, relying on the doctrine of "inferred intent," found no coverage, reasoning that an intentional injury exclusion will apply whenever "there is an intentional act on the part of the insured and it is inherent in that act that harm will occur."  *Id.* at 860.  The Pennsylvania Supreme Court found otherwise.  Although the friend's overdose was "exactly the type of evil inherent in the use of heroin," the court explained that in Pennsylvania, an insured's

13

intent to cause harm may be inferred as a matter of law only in one specific factual context, namely, where injury arises from allegations of child sexual abuse. *See id.* at 863-64; *Wiley v. State Farm Fire & Cas. Co.*, 995 F.2d 457, 464-65 (3d Cir. 1993). In all other cases, courts should "look[] to the insured's actual subjective intent," regardless of whether the resulting injury is a reasonably foreseeable consequence of the insured's actions.[5] *See Greenfield*, 855 A.2d at 863 (quoting *Wiley*, 995 F.2d at 460). Thus, in the general liability context at least, Pennsylvania law requires that an insured subjectively intend to cause damage of the same general type for which he or she is being held accountable before an intentional injury exclusion can apply.

Although *Elitzky* and *Greenfield* were decided in the general liability context, the reasoning supporting *Elitzky*'s interpretation of "intent"—namely, that the provisions of an insurance policy be construed in favor of maximum coverage for the insured—applies with equal force in the employers' liability insurance context. *See, e.g.*, *Nautilus Ins. Co. v. Bike & Build, Inc.*, 340 F. Supp.3d 399, 408 (E.D. Pa. 2018) (Pennsylvania law requires that insurance contracts be construed in favor of coverage). Accordingly, applying the *Elitzky* court's definition of "intent" to the instant action, Exclusion C.5 bars coverage only if the Mercers' allegations are that Defendants acted with the subjective intent to cause or aggravate Mercer Jr.'s bodily injury, that is, with the desire to cause or aggravate his bodily injury or with the knowledge that such a result was substantially certain to occur. *See Elitzky*, 517 A.2d at 989. Coverage will not, however, be precluded if Mercer Jr.'s injury was merely a "reasonably foreseeable" consequence of Defendants' alleged actions. *See id.* at 987.

---

[5] The *Greenfield* court did ultimately affirm the Superior Court's denial of coverage on different grounds, finding that it would be against public policy to provide liability coverage "for damages that arise out of an insured's criminal acts regarding a Schedule I substance." *Greenfield*, 855 A.2d at 866.

14

### 2. *Mercer Jr.'s* **Martin** *Claim*

In arguing that Exclusion C.5 applies, Zenith repeatedly focuses the Court's attention on the following allegations in the underlying complaint: "From November 2, 2016, the date of Dr. Bandulak's Order to November 17, 2017, the date that [MPN] fired Mercer, [MPN] was *substantially certain* that Mr. Mercer would suffer harmful contacts with lead and cadmium that would aggravate the lead accumulation in Mercer's brain to permanent, irreversible, brain damage." This allegation does suggest that Defendants intended Mercer Jr.'s injuries. Zenith omits to mention, however, that this allegation is offered only in support of Count Three of the underlying complaint, which purports to state a claim for battery, a distinct cause of action. The allegations set forth in support of Count One, Mercer Jr.'s *Martin* claim, are materially distinct and do not, moreover, incorporate the allegations that the Mercers make in Count Three. *See* Fed. R. Civ. P. 8(d)(2) (permitting alternative pleading); *see also* Fed. R. Civ. P. 8(e) (pleadings must be construed so as to do justice). Count One alleges, among other things, that Mercer Jr.'s blood level results put MPN on notice that he was lead-poisoned, and that MPN "knowingly and fraudulently" concealed and misreported these results to "deceive Mercer about Mercer's mandatory Medical Removal Benefits" and to deceive him about his initial lead poisoning. It alleges that Defendants' deception caused Mercer Jr. to continue soldering parts into radiators, which "aggravated the initial accumulation of lead in Mercer's brain to permanent brain damage." Count One does not allege that Defendants desired to aggravate Mercer Jr.'s lead poisoning or acted with knowledge that such result was substantially certain to occur.

At oral argument, Zenith suggested that an employee may not succeed on a *Martin* claim without first establishing that its employer acted with knowledge that the employee's preexisting injury was substantially certain to be aggravated by the employer's misconduct. In other words,

15

Zenith suggests that intent to aggravate bodily injury is a required element of the employee's burden of proof under *Martin*. If Zenith were correct, then Exclusion C.5 would necessarily preclude coverage for such claims. *See Elitzky*, 517 A.2d at 989; *see also Belair Motors, Inc. v. Universal Underwriters Ins. Co.*, 2005 WL 8176439, at *9-11 (W.D. Pa. July 26, 2005) (coverage barred for tortious interference with contract claim where policy excluded coverage for intentional harms and proof of intent to harm was a required element of the underlying claim).

But contrary to Zenith's position, Mercer Jr. need not allege that Defendants intended to aggravate his bodily injury in order to succeed on his *Martin* claim. Rather, to state a *Martin* claim, an injured employee must first establish the employer's fraud by showing: (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and, (5) damage to the recipient as the proximate result. *Martin*, 606 A.2d at 448 (quoting *Scaife Co. v. Rockwell-Standard Corp.*, 285 A.2d 451, 454 (Pa. 1971)). The employee must show a particular type of damage resulting from the employer's misrepresentation, namely, the aggravation of a preexisting work-related injury. *Id.* at 448. In other words, the injured employee must prove only that its employer intended to deceive the employee by deliberately concealing, altering, or misrepresenting information relating to the employee's preexisting injury, and that the employee's injury was aggravated as a proximate result. *See Winterberg*, 72 F.3d at 323. Although such aggravation may, like the overdose at issue in *Greenfield*, be reasonably foreseeable, nowhere in its *Martin* decision does the Pennsylvania Supreme Court require an injured employee to establish that the employer, through

its fraudulent actions, intended to cause the resulting aggravation.[6] Thus, Exclusion C.5—which, again, precludes coverage only for "[b]odily injury intentionally caused or aggravated" by an insured—does not clearly preclude coverage for Mercer Jr.'s *Martin* claim. Mercer Jr.'s *Martin* claim potentially comes within the scope of the Policy, and Zenith is therefore obligated to tender a defense. *See Post*, 691 F.3d at 517-18.

Because Zenith's duty to defend was triggered by Mercer Jr.'s *Martin* claim, Zenith's remaining arguments—concerning the applicability of the C-4 Exclusion (the workers' compensation exclusion), which, as Zenith concedes, does not apply to *Martin* fraudulent misrepresentation claims, and the availability of coverage for Mercer III's medical monitoring claim—need not be reached.

### C. Zenith's Duty to Defend a Non-Insured

There is, however, one issue left to resolve. Both MPN and Newell seek coverage from Zenith with respect to the underlying action. Newell is not, however, named as an insured under the Policy. The Policy defines "insured" as follows:

> You are insured if you are an employer named in Item 1 of the Information Page. If that employer is a partnership, and if you are one of its partners, you are insured, but only in your capacity as an employer of the partnership's employees.

---

[6] Zenith's cite to *Seneca Ins. Co., Inc. v. Cybernet Entm't, LLC*, 760 F. App'x 541 (9th Cir. 2019), is thus misplaced. In *Seneca* (an unpublished, out-of-jurisdiction case) the court considered whether an intentional injury exclusion contained in an employers' liability policy barred coverage where an employee alleged that its employer, a pornographic video producer, intentionally misrepresented that it had safety measures in place to protect its employees from contracting sexually-transmitted diseases during shoots. *Id.* at 544-45. The court noted that California courts have interpreted intentional injury exclusions pursuant to California Insurance Code § 533, which bars coverage for claims arising from "an act done with intent to injure, *i.e.*, an act deliberately done for the express purpose of causing damage or done with knowledge that damages were *highly probable* or substantially certain to result." *Id.* at 544 (emphasis added) (citation and internal quotations omitted). Applying this more expansive definition of "intent," the Ninth Circuit affirmed the lower court's finding that the employee alleged intentional conduct excluded under the policy, explaining that "[a] performer induced to perform by a false representation that [the employer] had safety measures in place to protect performers could *foreseeably* contract an STD as a result of the false inducement." *Id.* at 545 (emphasis added). In Pennsylvania, however, the mere foreseeability of injury is insufficient to establish the insured's intent when applying an intentional injury exclusion. *See Elitzky*, 517 A.2d at 987.

Item 1 of the Policy's Information Page names only "MPN Incorporated DBA: Active Radiator Supply," and does not list Newell. While the Policy does provide coverage for partners where the named insured is a partnership, Defendants do not contend that MPN is a partnership or Newell one of its partners.

Part Two's coverage provision provides: "We [the insurer, Zenith] will pay all sums that you [the insured employer, MPN] must pay as damages because of bodily injury to your employees." By its clear terms, Part Two extends liability coverage only to MPN, and does not obligate Zenith to pay damages on Newell's behalf. Because the Policy's coverage does not extend to Newell, Zenith does not have a duty to defend Newell in the underlying action and, accordingly, does not have a duty to indemnify Newell should the Mercers succeed on any of their claims. *See Rep. Servs. of Pa., LLC v. Caribbean Operators, LLC*, 301 F. Supp.3d 468, 474 (E.D. Pa. 2018). As to MPN, the question of indemnity is not ripe for adjudication, as liability has yet to be determined in the underlying action. *See id.*

An appropriate order follows.

**March 19, 2021**                                             **BY THE COURT:**

　

　                                                                             _____
　                                                                             **WENDY BEETLESTONE, J.**